# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| |  |
|---|---|
| DALE E. BAIN,<br><br>           Plaintiff,<br><br>           v.<br><br>HOWARD UNIVERSITY,<br><br>           Defendant. | Civil Action 11-1639 (RC) |

## MEMORANDUM OPINION

Dale Bain was a student at the Howard University College of Medicine from August 2005 until March 2009, when he was dismissed for academic reasons. He brought this suit for breach of his educational contract with Howard, which has moved for summary judgment. Any claims that accrued before September 2008 are time-barred, and no reasonable jury could find that Mr. Bain's dismissal was arbitrary or motivated by ill will. Howard's motion for summary judgment will therefore be granted.

## I. BACKGROUND

In August 2005, Dale Bain entered the Howard University College of Medicine. He successfully completed his first year of medical school. Pl.'s Opp., Ex. 3 (Affidavit of Dale Bain (Dec. 7, 2012)) ("Bain Aff."), at ¶¶ 1–2. In his second year, he failed an examination on the central nervous system and appealed the failing grade, on the grounds that it was not calculated properly. His appeal was denied, but he was allowed to retake the exam and passed on the second attempt. *Id.* at ¶¶ 9–11. Mr. Bain also failed Step 1 of the United States Medical Licensing Examination, Def.'s Mot., Ex. 2 (Deposition of Sheik N. Hassan (Sept. 11, 2012)) ("Hassan Dep."), at 8, 37, which Howard students must complete at the end of their second year,

*id.*, Ex. 6, Attachment 1 (University and College of Medicine Policies Affecting Students, 2006–2007), at 8–9; *see also Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 89 (D.D.C. 2010) ("Howard students are required to earn a passing score on the United States Medical Licensing Examination ("USMLE") Step 1 in order to enter their third year . . . ."). He passed the test on his second try and advanced to his third year. Hassan Dep. at 8, 37.

In the third year of medical school, students typically study in a clinical setting. Howard students must pass the National Board of Medical Examiners' test in the subject of each clerkship (as the clinical courses are called) in order to pass the course itself. Def.'s Mot., Ex. 1 (Pl.'s Answers to Def.'s Request for Admissions (May 29, 2012)) ("Pl.'s Admissions"), at ¶¶ 93–94; *id.*, Ex. 6 (Declaration of Sheik N. Hassan (Nov. 13, 2012)) ("Hassan Decl."), at ¶¶ 3–4; *see also Mesumbe*, 706 F. Supp. 2d at 89 ("Students are also required to pass 'shelf' examinations, or standardized examinations given by the National Board of Medical Examiners ("NBME"), at the conclusion of each 'clerkship,' or course of study, during their third year in order to successfully complete that year."). In his third year, Mr. Bain failed the NBME examinations in Psychiatry and Surgery—both of which he retook and failed a second time—as well as Obstetrics and Gynecology, which he did not retake. Pls.' Admissions at ¶¶ 21–22, 37–38, 41; Def.'s Mot., Ex. 5 (Def.'s Responses to Pl.'s Request for Interrogatories) ("Def.'s Interrogatories"), at 12–13. Because he failed the NBME examinations, he failed the clerkships. Def.'s Mot., Ex. 4 (University and College of Medicine Policies Affecting Students, 2007–2008) ("2007–08 Policies"), at 35 ("Any student who fails the written examination must sit for the next offering of the examination in the clerkship. A student who fails the reexamination fails the clerkship . . . .").

Under Howard's policies, Mr. Bain could have been dismissed from medical school at that point, or else required to repeat his entire third year. 2007–08 Policies at 24 ("Any student who fails two clerkships . . . in the same academic year . . . will either be dismissed from the College of Medicine or required to repeat the entire academic year . . . ."); *see also Mesumbe*, 706 F. Supp. 2d at 89 ("The University Policies state that a student who fails two or more clerkships will either be dismissed from the College of Medicine or repeat the academic year." (internal quotation marks omitted)). Howard allowed him to repeat his third year, and communicated that decision in a letter dated July 14, 2008. That letter informed Mr. Bain that he would be "required to take and pass all components of all courses/clerkships of the new junior year," and to "obtain satisfactory grades based upon the respective department's clerkship or course and examination requirements." Def.'s Mot., Ex. 10 (Letter from Sheik N. Hassan to Dale Bain (July 14, 2008)). It also stated, in capital letters, "IF YOU FAIL ANY CLERKSHIP OR COURSE, YOU WILL BE DROPPED FROM THE COLLEGE OF MEDICINE." *Id.* This condition was consistent with Howard's policies, which provided that "[a] repeating student who fails any . . . clerkship . . . during the repeat year will be dismissed from the College of Medicine." 2007–08 Policies at 46. Mr. Bain signed the letter on July 18, 2008, making a check mark to indicate that he accepted the terms stated therein.

In his second attempt at his third year of medical school, Mr. Bain failed the NBME examinations in Pediatrics, Psychiatry, and Obstetrics and Gynecology; he retook the first two of those tests and failed again. Pl.'s Admissions at ¶¶ 52–53, 72–73, 80. He was informed that he would be dismissed from the College of Medicine and filed an internal appeal, which was heard

by a student grievance committee. *Id.* at ¶¶ 167–71. The committee denied his appeal, and he was dismissed in March 2009. *Id.* at ¶ 2.

Mr. Bain filed suit that August, alleging that Howard had breached its contract with him by not calculating his grades according to the school's policy. Complaint, *Bain v. Howard Univ.*, 09-cv-1605 (D.D.C. Aug. 24, 2009). That suit was dismissed without prejudice because Mr. Bain had not identified any policy that was violated. Order, *Bain v. Howard Univ.*, 09-cv-1605 (D.D.C. Sept. 27, 2010).

Mr. Bain filed this suit in September 2011, again alleging breach of contract, and asserting that "Howard breached the student contract by not calculating Mr. Bain's grades according to Howard policy and, by doing so, illegally failed Mr. Bain." Am. Compl. ¶ 58. He also alleges that Howard failed to comply with a number of standards promulgated by the Liaison Committee on Medical Education, which accredits medical schools in the United States. Howard has moved for summary judgment.

## II. LEGAL STANDARD

Summary judgment may be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if sufficient evidence exists such that a reasonable jury could return a verdict for the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party bears the initial responsibility of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Id.* at 323; FED. R. CIV. P. 56(c)(1)(A) (noting that the movant may cite to "depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials"). In response, the non-moving party must similarly designate specific facts in the record that reveal a genuine dispute that is suitable for trial. *Celotex*, 477 U.S. at 324.

On a motion for summary judgment, the court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-moving party, *Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III.  ANALYSIS

Under District of Columbia law, "a judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference." *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1108 (D.C. 1999); *accord Paulin v. George Washington Univ. Sch. of Med. & Health Sci.*, 878 F. Supp. 2d 241, 246–47 (D.D.C. 2012); *Jung v. George Washington Univ.*, 875 A.2d 95, 108 (D.C. 2005). "Accordingly, in cases involving academic dismissal, educational institutions [are] entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder 'could conclude that there was no rational basis for the decision or that it was motivated by bad

5

faith or ill will unrelated to academic performance.'" *Alden*, 734 A.2d at 1109 (quoting *Clements v. Nassau County*, 835 F.2d 1000, 1004 (2d Cir. 1987)); *accord Paulin*, 878 F. Supp. 2d at 247; *Jung*, 875 A.2d at 108. "Only the most compelling evidence of arbitrary or capricious conduct would warrant interference with the performance evaluation . . . of a . . . student made by his teachers." *Jung*, 875 A.2d at 108 (quoting *Greenhill v. Bailey*, 519 F.2d 5, 10 n.12 (8th Cir. 1975)). As the D.C. Court of Appeals has explained,

> This "judicial reluctance to intervene" is based upon "sound considerations of public policy." *Olsson v. Bd. of Higher Educ.*, 402 N.E.2d 1150, 1153 (N.Y. 1980). When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession. *See id.* Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, "it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis." *Id.* In addition, to involve the courts in assessing the propriety of a particular grade would encourage endless litigation by unsuccessful students and "undermine the credibility of the academic determinations by educational institutions." *Susan M. v. N.Y. Law Sch.*, 556 N.E.2d 1104, 1107 (N.Y. 1990). This rule of judicial nonintervention is "particularly appropriate in the health care field" where the students who receive degrees will provide care to the public, *Burke v. Emory Univ.*, 338 S.E.2d 500, 501 (Ga. Ct. App. 1985); *see also Bilut v. Nw. Univ.*, 645 N.E.2d 536, 542 (Ill. App. Ct. 1994), and because "'courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.'" *Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1063 (N.D. Ga. 1977) (quoting *Connelly v. Univ. of Vt. & State Agric. Coll.*, 244 F. Supp. 156, 160–61 (D. Vt. 1965)).

*Alden*, 734 A.2d at 1109–10 (citations altered); *accord Kraft v. William Alanson White Psychiatric Found.*, 498 A.2d 1145, 1148–49 (D.C. 1985) ("Whether [a student's] clinical supervisors were accurate in their evaluations of his clinical work is not a question for the court. An academic judgment of school officials that a student does not have the necessary clinical ability to perform adequately and was making insufficient progress toward that goal is a determination calling for judicial deference."); *see also Abbariao v. Hamline Univ. Sch. of Law*,

258 N.W.2d 108, 112 (Minn. 1977) (holding that the determination "whether a student's educational performance was unsatisfactory . . . . is a professor's and not a judge's function").

Howard argues that Mr. Bain was dismissed because he repeatedly failed the examinations associated with his clerkships and that the university is therefore entitled to summary judgment, because no reasonable jury could find that Mr. Bain's dismissal was either arbitrary or motivated by ill will. Mr. Bain responds first that he was dismissed in violation of his contractual right to be evaluated in accordance with the standards set out by the Liaison Committee on Medical Education, and second that his dismissal was motivated by ill will over his comments on a student-run website. The court will consider those contentions in turn.

It is beyond dispute that there is a contractual relationship between a university and its students. *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007) ("[W]e recognize the general rule 'that the relationship between a university and its students is contractual in nature . . . .'" (quoting *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977)); *Kraft*, 498 A.2d at 1148 ("The relationship between an educational institution and its students is contractual in nature."). Under D.C. law, all contracts contain an implied covenant of good faith and fair dealing. *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000) (citing *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988)). An academic dismissal in bad faith violates that covenant, *see Alden*, 734 A2d at 1109, and, in the academic context, "'fair dealing' involves reasonable rather than arbitrary or capricious action," *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (citing *Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999)); *Alden*, 734 A.2d at 1111 n.11 (holding that because a student did not argue that the decisions to dismiss him "were based on bad faith or were arbitrary and capricious . . . . Georgetown cannot be found liable for breach of the implied

covenant of good faith and fair dealing")). Because judicial review of academic decisions is limited to the question of whether they were made arbitrarily or in bad faith, *Alden*, 734 A.2d at 1109—which is to say, whether a school has violated its implied covenant of good faith and fair dealing, *Allworth*, 890 A.2d at 201–02—that implied covenant is *the entire contract* concerning academic matters between a school and its students, *see Jansen*, 440 F. Supp. at 1063 ("As long as the decision to dismiss [a student] was essentially academic . . . it is not subject to judicial review as a breach of the educational contract.").[1]

     Nonetheless, a school's failure to comply with published policies can be evidence of arbitrariness. That is the essence of Mr. Bain's first argument, except that it is not Howard's policies that he invokes. Rather, Mr. Bain argues that Howard has failed to abide by the Liaison Committee on Medical Education's standards for accrediting medical programs leading to an M.D. He claims that Howard has neither stated the objectives of its program in outcome-based terms, nor evaluated its students and the effectiveness of its program in the way that the LCME suggests, nor complied with LCME standards for the confidentiality of student records. Even if such alleged failures (which Howard denies) would be enough to establish the arbitrariness of Howard's decision to dismiss Mr. Bain—an unlikely proposition, as they do not touch on the validity of the examinations that formed the stated basis of Mr. Bain's dismissal—he has not identified any statement or document in which Howard promised to abide by LCME guidelines.

---

    [1] Recognizing that judicial deference to academic decisions is not a normal principle of contract law, some courts have suggested that the student-university relationship cannot be completely described in terms of those principles. *See, e.g.*, *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975) ("The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category."); *Abbariao*, 258 N.W.2d at 113 ("Elements of the law of contracts have been applied to the student-university relationship, but rigid importation of contractual doctrine has been rejected.").

This is not a case in which a student is attempting to hold his school to its own published policies: rather, Mr. Bain is trying to hold Howard to LCME standards, none of which bears on the question of whether Howard could dismiss a student who repeatedly failed the examinations associated with his clerkships. As best the court can understand it, Mr. Bain's argument appears to be that 1) because the LCME chose to accredit Howard, Howard was obligated to follow LCME guidelines, and 2) had Howard done so, Mr. Bain would have performed better on his examinations, so 3) Mr. Bain is entitled to contractual damages and readmission.[2] The first proposition gets the relationship between Howard and the LCME backwards. An accrediting institution evaluates a school, and is free to withhold or rescind accreditation as it sees fit, but Mr. Bain offers no reason to conclude that the school, by accepting accreditation, promises its students that it will adhere to the accrediting body's standards. And the second proposition—that Mr. Bain would have performed better if Howard had acted differently—is not nearly enough to "establish . . . evidence from which a fact finder 'could conclude that there was no rational basis for the decision'" to dismiss Mr. Bain. *Alden*, 734 A.2d at 1109 (quoting *Clements*, 835 F.2d at 1004). The court therefore moves on to his argument that the decision was motivated by ill will.

---

[2] Alternatively, Mr. Bain may simply be arguing that his academic performance should have been judged more holistically, that failing his NBME exams should not have been enough to warrant dismissal. At times he construes the LCME accreditation standards to support this argument. But Mr. Bain admits that under Howard's policies, failing the NBME exam meant that he would fail the associated clerkship, Pl.'s Admissions at ¶¶ 93–94, and he agreed that failing any clerkship in his second attempt at his third year would lead to his dismissal, Def.'s Mot., Ex. 10 (Letter from Sheik N. Hassan to Dale Bain (July 14, 2008)). To the extent that Mr. Bain is quarreling with the wisdom of Howard's academic requirements, that is surely a matter calling for judicial deference. *See Alden*, 734 A.2d at 1108.

Mr. Bain has testified that, in March 2005 (several months before he matriculated) a number of Howard medical students staged a protest against the school. He does not recall the precise subject of the protests, but believes that they concerned Howard's academic standards. One of the students involved in the protest committed suicide that October; Mr. Bain attended her memorial service, at which some of her classmates expressed their sadness and a wish that they had been able to prevent her death. *See* Def.'s Mot., Ex. 3 (Deposition of Dale Bain (Aug. 21, 2012)) ("Bain Dep."), at 216–19; Bain Aff. at ¶¶ 4–6.

While Mr. Bain was at Howard, he and his classmates maintained a website on which medical students posted comments. In September 2006, the website administrators had an online conversation about removing certain students from the website. Mr. Bain connected this discussion to the previous year's suicide, and aggressively expressed his concern that removing students from the website might be detrimental to their mental health. No students were actually removed. Bain Dep. at 16–27. In his deposition and his affidavit, Mr. Bain recounted several negative comments that he recalls faculty members making about his attitude and aptitude for medical studies, which he believes were connected to the aggressive comments that he made on the student website. *See, e.g.*, Bain Aff. at ¶¶ 22–26; Bain Dep. at 134–38.

From this series of events, Mr. Bain concludes that his discussion of the suicide on the student-run website generated ill will among the Howard faculty and administration, and that this ill will (rather than any legitimate academic concern) motivated his dismissal.[3] He supports this

---

[3] In his amended complaint, Mr. Bain alleges that several weeks after that online discussion on the website, "CBS made a visit to the medical school and raised some of the underlying issues surrounding the protest and the suicide," Am. Compl. ¶ 14, and that "[m]any on the medical school faculty blamed Mr. Bain for the adverse publicity," *id.* ¶ 15. At his deposition, Mr. Bain described a conversation with a Howard professor who told him "that CBS came in and showed a video about this stuff" at which point "it clicked to me that, okay, this is

10

conclusion by reference to the experience of other students who failed two clerkships who, he believes, were allowed to repeat only the clerkships they failed rather than an entire academic year. Bain Aff. at ¶¶ 15–21. Mr. Bain argues that they received more favorable treatment because Howard was more favorably predisposed towards them.

Howard again responds that Mr. Bain's dismissal was based upon his repeated failures of the NBME exams. Mr. Bain believes that Howard "manipulated my answers before submitt[ing] them to the NBME for scoring to ensure that I would fail the tests." Bain Aff. at ¶ 44. He further suggests that it is statistically implausible that any student could have consistently performed as poorly as he did, which should lead the court to infer that the exams were in fact manipulated. Howard responds that student performance is not a random statistical event: a weak student may often perform poorly, just as a strong student often performs well, so there is no reason to credit Mr. Bain's allegation that his scores were manipulated. In a supplemental declaration attached to its reply, Howard represents that it "receives examinations from the NBME . . . , administers the examinations, returns the examinations and student answer-sheets to NBME . . . , and receives numerical scores from the NBME after grading." Def.'s Reply, Ex. 2 (Supplemental Declaration of Sheik N. Hassan (Jan. 4, 2013)), at ¶ 5.

The stated reason for Mr. Bain's dismissal was his performance on the NBME examinations, which are not graded by Howard. Because those examinations were not graded by Howard, the grades could not have been motivated by ill will unrelated to academic performance

---

why I'm being targeted for publicity, bad publicity." Bain Dep. at 45. Although Mr. Bain does not raise this allegation in his summary judgment briefing, it makes no difference to the court's analysis whether he means to argue that Howard dismissed him out of ill will resulting from his comments on the student-run website, or from the media scrutiny that those comments allegedly generated, or both.

unless, as Mr. Bain alleges, the university altered his grade sheets before submitting them. He has provided no evidence to support his belief that this occurred.[4] In the absence of any "evidence from which a fact finder 'could conclude that there was no rational basis for the decision'" to dismiss Mr. Bain, or "'that it was motivated by bad faith or ill will unrelated to academic performance,'" *Alden*, 734 A.2d at 1109 (quoting *Clements*, 835 F.2d at 1004), the court must grant summary judgment to Howard.[5]

---

[4] Even if a reasonable jury could find that the decision to make Mr. Bain repeat his third year was the result of some hostility on the part of Howard, it could not conclude that the decision to dismiss him was similarly motivated. Mr. Bain would have preferred to repeat only the clerkships that he failed in his first attempt at his third year, which he believes that other students were allowed to do. Two of those clerkships were Psychiatry and Obstetrics and Gynecology, which he also failed the following year. Pl.'s Admissions at ¶¶ 21–22, 41, 72–73, 80. He would therefore have been subject to dismissal in March 2009 even if he had only repeated those two courses. 2007-08 Policies at 24 ("Any student who fails two clerkships . . . in the same academic year or who fails a clerkship . . . that he/she is repeating will either be dismissed from the College of Medicine or required to repeat the entire academic year . . . ."); Def.'s Mot., Ex. 7 (University and College of Medicine Policies and Procedures for Students, 2008-2009), at 49 ("Any student who fails two clerkships . . . in the same academic year or who fails a clerkship . . . that he/she is repeating will either be dismissed from the College of Medicine or required to restart the academic year . . . ; or required to repeat the academic year . . . .").

[5] To the extent that Mr. Bain intended to raise any claims based on events that occurred before September 9, 2008—including his grades in his first three years of medical school and the requirement that he repeat that third year—he has waived those claims by not responding to Howard's argument that they are time-barred by the District of Columbia's three-year statute of limitations for actions based in contract.

## IV.  CONCLUSION

For the reasons set forth above, the court will enter summary judgment in favor of Howard University.

                                                                Rudolph Contreras
                                                                United States District Judge

Date: September 30, 2013